UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONNIE A. CARDINALE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SCOTT R. JONES, et al.,<br><br>　　　　　Defendants. | No.  2:20-cv-01325-MCE-CKD<br><br>**MEMORANDUM AND ORDER** |

On July 1, 2020, Plaintiff Connie A. Cardinale ("Plaintiff") initiated the present action by filing the operative Complaint against Defendants Sheriff Scott R. Jones ("Jones"), Detective Clinton Robinson ("Robinson"), County of Sacramento (the "County"), and Sacramento County Sheriff's Department ("SCSD") (collectively, "Defendants").[1]  Presently before the Court is Plaintiff's Motion for Partial Summary Judgment, which has been fully briefed.  ECF Nos. 45 ("Pl.'s Mot."), 50 ("Defs.' Opp'n"), 54 ("Pl.'s Reply").  Plaintiff has also filed two Motions to Strike Defense Exhibits A and D, which Defendants oppose.  ECF Nos. 51, 52, 57, 58, 59.  In addition, Defendants subsequently filed their own Motion for Summary Judgment, ECF No. 61, which Plaintiff seeks to strike as well, ECF No. 63.  For the following reasons, Plaintiff's Motions to

---

[1] Defendant Xavier Becerra was previously dismissed pursuant to stipulation on August 17, 2021. See ECF Nos. 39, 41.

Strike portions of Defendants' evidence are GRANTED in part and DENIED as moot in part, Plaintiff's Motion to Strike Defendant's Summary Judgment Motion is DENIED, Defendants' Motion for Summary Judgment is GRANTED, and Plaintiff's Motion for Partial Summary Judgment is DENIED.[2]

## BACKGROUND[3]

### A.  Events Occurring on December 25, 2019

On December 25, 2019, Plaintiff and her son Ryan Stucky ("Stucky"), who suffers from schizophrenia, were having Christmas dinner when Stucky "had to go to the restroom and the only restroom [that] was working at the time was the one in [her] bedroom." Ex. B, Cook Decl., ECF No. 45-2, at 26 (police report); see also id. at 2 ¶ 5 (stating that the report incorrectly lists the event date as December 26, when it should have been December 25). Plaintiff explained the following:

> I don't have people go in my room because I keep guns in there and I have one gun under my pillow I sleep with which was a .38 caliber [Smith & Wesson revolver, serial number CPR8043]. I keep two guns in my safe which I only know the code to and a couple rifles in my closet.

Ex. B, id., at 26. While Stucky was in the bathroom, Plaintiff "was hanging clothes up in the closet while [she] waited for him to come out of the bathroom." Id. When he came out, Stucky asked for something and although Plaintiff could not recall what he asked for, she remembered saying no. Id. Stucky "started to yell at [her] and out of nowhere he started punching [her] several times to the face." Id. He then repeatedly kicked Plaintiff in the face, body slammed her, and hit her with a wooden dowel taken from the

---

[2] Because oral argument would not have been of material assistance, the Court did not set these matters for a hearing and instead decides them on the briefs. E.D. Local Rule 230(g).

[3] Unless otherwise noted, the following recitation of facts is taken, primarily verbatim, from Plaintiff's Separate Statement of Undisputed Facts and Defendants' Response thereto. See ECF Nos. 45-1, 50-1.

2

sliding glass door. See id.[4] Stucky eventually left the bedroom at which point Plaintiff "crawled to the bathroom and locked the door." Id. at 27. She texted a friend for help using her iPad and remained in the bathroom to wait for the police. See id. Meanwhile, Stucky fled the house and took the .38 caliber revolver Plaintiff kept under her pillow.

Three SCSD deputies were dispatched to respond to a family disturbance based on the following: "The text of the call related the caller received a text message from their friend, [Plaintiff], who told the caller tha[t] [Plaintiff]'s son, [Stucky], was trying to kill [Plaintiff] and that he had a gun. The text further related [Plaintiff] was locked in a bathroom." Ex. B, Paul Decl., ECF No. 50-2, at 20. The responding SCSD deputies found Plaintiff in the bathroom, and she informed them that Stucky stole her .38 caliber revolver and that she had more firearms in the closet. Ex. C, Cook Decl., ECF No. 45-2, at 32–33 (police report). One deputy "observed an open black handgun case on the bed in the master bedroom," which was empty. Id. at 32. It is undisputed that Stucky did not physically assault Plaintiff with the revolver.

Plaintiff also claims that she told the deputies at this time that Stucky did not live in her home, he did not have access, and he was only there for Christmas dinner. See Cardinale Decl., ECF No. 10-1, ¶ 3. However, in one of the police reports, the deputy wrote that Plaintiff was only "complaining of extreme pain to her face and upper torso[,]" and that "at the time she appeared to be completely bewildered." Ex. B, Paul Decl., ECF No. 50-2, at 29. Furthermore, in her statement to a SCSD deputy the following day, Plaintiff stated, in relevant part, that Stucky "lives in the trailer in the back of the house[,]" that Plaintiff does not allow him in her house, and that she is the only one with keys to her house. Id. at 25. In any event, the responding deputies summoned medical aid for Plaintiff, and she was eventually taken to the hospital. See Ex. C, Cook Decl., ECF No.

---

[4] Plaintiff moves to strike Defendants' Exhibits A (photos of Plaintiff in the aftermath of her attack) and D (a police Computer-Aided Dispatch ("CAD") report). The Court concludes that the photos are unnecessary to resolve the instant motion and there is no basis on which to leave them in the public record. Plaintiff's Motion to Strike Exhibit A is thus GRANTED. As for the CAD report, it was also unnecessary to the Court's resolution of this case, but there is no reason to strike it from the record. Plaintiff's Motion to Strike Exhibit D is thus DENIED as moot.

45-2, at 32.  Stucky was not located that night.  See id.

During a search of Plaintiff's house, the deputies seized the following rifles and shotgun from the walk-in bedroom closet ("Long Guns"):  (1) Remington 870 Pump .20 guage Shotgun, serial number RS50085H; (2) Savage 99E Bolt Action 243-caliber Rifle, serial number 1111846; (3) Ruger 10-22 Semi-Automatic .22 caliber Rifle, serial number 35754232; and (4) Winchester 270 22-caliber Rifle.  The guns were seized for "safekeeping" but without a warrant or Plaintiff's consent.

### B.     Events Occurring on December 26, 2019

The following day, on December 26, 2019, two SCSD deputies were dispatched to Plaintiff's residence at 12:23 p.m. based on a call that Plaintiff "and a friend were trying to return to the scene but they wanted Deputies to check the residence for [Stucky] first."  Ex. C, Cook Decl., ECF No. 45-2, at 33.  Plaintiff "was advised to not arrive at the scene."  Id.  A SCSD canine handler, multiple deputies, and the Special Enforcement Detail ("SED") also responded, and they established a perimeter around the residence.  See id.  Two of the deputies noted in their reports that Stucky was "possibly armed with a firearm[,]" that Plaintiff's "firearm had been stolen during the incident" the night before, and that a records check of Stucky "revealed he was prohibited from possessing firearms."  Ex. C, Paul Decl., ECF No. 50-2, at 40, 48.

One of the deputies made 26 phone calls and sent three text messages to Stucky's cell phone during a 50-minute period beginning at 2:41 p.m., but Stucky never answered his phone, and the deputy was unable to leave a voicemail.  See Ex. C, Cook Decl., ECF No. 45-2, at 33.  The canine handler and SED personnel eventually observed Stucky but in response to their commands, Stucky "ran into an out building on the south side of the property."  Ex. C, Paul Decl., ECF No. 50-2, at 48.  The officers then established another perimeter around the outbuilding, but Stucky was subsequently seen exiting the building "holding a silver revolver with a black grip in his right hand."  Id.  "For the next several hours, [Stucky] refused to comply with deputies['] orders to exit the building."  Id.  At 5:31 p.m., a chemical agent was deployed into the outbuilding and

4

Stucky finally exited. Id. Stucky was thereafter detained and taken into custody. See Ex. C, Cook Decl., ECF No. 45-2, at 33. The stolen .38 caliber revolver was subsequently recovered. Id. ("A search of the room where [Stucky] was barricaded revealed the Smith & Wesson firearm he had stolen from [Plaintiff].").

**C.  Search Warrant**

To assist the assigned SCSD deputies, Robinson offered to prepare a search warrant application for the premises owned by Plaintiff for submission to the State of California Superior Court. It is undisputed that Robinson never went to the residence and that he relied on information and verbal reports from deputies and SCSD's Computer Aided Dispatch ("CAD") entries regarding the events of December 25–26, 2019. Robinson's search warrant application consisted of 14 pages, but the application did not contain any police reports. See generally Ex. F, Cook Decl., ECF No. 45-2, at 39–52 ("Search Warrant"). The search warrant application sought authorization to search Plaintiff's entire property and all vehicles, as well as, among other things, the following:

> 2. Items related to firearms including firearms, expended slugs, spent casings, bullet holes, ammunition, magazines, gun cleaning kits, gun purchase receipts/registration papers, holsters, gun cases.
>
> . . .
>
> 4. Any and all financial documents tending to establish if the motive for the attempted homicide was for financial gain.
>
> 6. Items of personal property tending to establish the identity of the persons in control of the premises including utility company receipts, rent receipts, addressed envelopes, vehicle registration, identification cards, photographs, video/audio tapes and keys.
>
> 7. Telephone directories, address books, calendars and documents with names and telephone numbers tending to establish the identity of friends, associates and family members of the persons in control of the premises.
>
> 8. Digital storage devices including, but not limited to, computers, computer hard drives, computer storage media including compact discs, DVD's and removable storage devices, digital cameras, personal digital assistance (i.e.: Palm

5

>Pilots, Blackberry's, etc.), and digital audio recorders.  Any writings, paper medium, notebooks and loose paper sheets, any computing or data processing software, stored on any type of medium such as hard disks, floppy disks, cassette tapes, compact disks, RAM or ROM units, or other permanent or transient storage medium, any computing or data processing device(s) and associated peripheral equipment, including but not limited to computer units, keyboards, video display tubes, printers, hard disk drives, floppy disk drives, floppy diskettes, optical disk drives, optical diskettes, tape drives, magnetic tape, compact disk drives, compact diskettes, interconnection cables, and modems, whether acoustic or electric.  Any computing or data processing literature including instruction books, manuals, or listed computer programs in whole or in part for the above computer or data processing equipment; and records which show dominion, ownership or control of any of the items to be seized, including bills of sale for computers or modems, repair bills for computers or modems, and sales receipts for floppy disks.  Deputies are permitted to conduct a detailed search of the electronic contents of these digital storage devices through means of forensic examination.
>
>9.   Wireless electronic devices/cellular telephones and cellular telephone accessories including, but not limited to, SIM cards, and electrical cords for charging phones.  Wireless/cellular telephones to include SIM cards, flash memory, and memory chips for each telephone.
>
>. . .
>
>10.   Any and all locked safes, locked boxes, chests, etc., which could contain evidence related to the shooting.
>
>11.   Any and all illegal narcotics and prescription narcotics within the confines of the residence.

Id. at 41–42 (no item number 5 listed).

In his deposition, Robinson estimated that he submitted the search warrant application to the district attorney around 4 p.m. on December 26, 2019.  See Ex. G, Robinson Dep., ECF No. 45-2, at 59–60.  The state court magistrate signed the warrant application on December 26, 2019, at 6:32 p.m., after Stucky was taken into custody.  See Ex. F, Cook Decl., ECF No. 45-2, at 43.  SCSD deputies subsequently seized the following handguns from inside Plaintiff's safe:  (1) Smith & Wesson .40-caliber semi-automatic, serial number PAH7163; and (2) Kahr 9MM semiautomatic, serial number EF3234.

**D.     Subsequent Events**

6

Stucky was charged with violating California Penal Code §§ 245(a)(1) (assault with a deadly weapon other than a firearm), 368(b)(1) (infliction of serious harm on an elder), 29800(a)(1) (felon in possession of a firearm), and 148(a)(1) (resisting and delaying a police officer). He was sentenced to four years in state prison.

It is undisputed that Plaintiff lawfully acquired all her firearms and submitted to the required background checks when she purchased them. After Stucky was convicted, beginning in March 2020 and continuing thereafter, Plaintiff made repeated requests to the SCSD and California Bureau of Firearms (the "Bureau"), an agency within the California Department of Justice, for the return of her firearms, but the SCSD and Bureau rejected her requests. On June 12, 2020, by letter sent via email to Jones and the Sacramento District Attorney, Plaintiff's counsel demanded that SCSD return the seized firearms to Plaintiff. In response, the Sacramento District Attorney's Office sent the following email: "Our records indicate our office issued a property release that was sent to the Sheriff's Department on 2/26/20." Ex. M, Cook Decl., ECF No. 45-2, at 143 (email dated June 12, 2020).

Ultimately, SCSD refused to return Plaintiff's firearms until she received statutory authorization from the Bureau pursuant to California Penal Code § 33855. According to a declaration from Plaintiff's counsel, neither the SCSD nor the Bureau responded to his June 12, 2020, letter. See Cook Decl., ECF No. 45-2, at 4 ¶ 15. However, defense counsel counters in his own declaration that after accepting assignment of this case, he "promptly contacted Plaintiff's counsel to discuss the return of Plaintiff's firearms" and took affirmative actions to procure the forms and records required by the Bureau. See Paul Decl., ECF No. 50-2, at 2–3 ¶¶ 4–14; see also Ex. H, id., at 96–121 (email correspondence between counsel). Counsel for Defendants was informed that Plaintiff's long guns were not registered under "Cardinale," but her former name "Stucky." Defs.' Sep. Statement of Undisputed Facts and Pl.'s Responses Thereto, ECF No. 64-1, No. 66. The State of California Department of Justice, Bureau of Firearms required that Cardinale provide her marriage certificate reflecting her married name "Stucky" and that

7

1  Ms. Cardinale complete a Firearm Ownership Report.  Id.  Plaintiff did not complete the
2  forms until June 2021, and her firearms were released to her very shortly thereafter.  Id.,
3  Nos. 72, 74-75.

**STANDARD**

6  The Federal Rules of Civil Procedure[5] provide for summary judgment when "the
7  movant shows that there is no genuine dispute as to any material fact and the movant is
8  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.
9  Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to
10 dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

11 Rule 56 also allows a court to grant summary judgment on part of a claim or
12 defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may
13 move for summary judgment, identifying each claim or defense—or the part of each
14 claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.
15 Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a
16 motion for partial summary judgment is the same as that which applies to a motion for
17 summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic
18 Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary
19 judgment standard to motion for summary adjudication).

20 In a summary judgment motion, the moving party always bears the initial
21 responsibility of informing the court of the basis for the motion and identifying the
22 portions in the record "which it believes demonstrate the absence of a genuine issue of
23 material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial
24 responsibility, the burden then shifts to the opposing party to establish that a genuine
25 issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co., Ltd. v.
26 Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co.,
27 391 U.S. 253, 288–89 (1968).

---

[5] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure.

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd,

810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

### A. The Parties' Positions

Both sides seek judgment, at least in part, under Rule 56. Plaintiff seeks partial summary judgment as to all claims against the County and SCSD. She contends that: (1) the warrantless seizure of her guns on December 25 violated the Second and Fourth Amendments; (2) the warrant issued on December 26 was overbroad in violation of the Fourth Amendment; (3) the December 26 seizure of her guns pursuant to that warrant violated the Second and Fourth Amendment; and (4) the County's continued seizure of her weapons was also in contravention of both the second and Fourth Amendments.

Defendants seek judgment on each of Plaintiff's claims in their entirety.[6] According to Defendants, Plaintiff cannot show she is entitled to judgment on any of those causes of action because: (1) although Defendants admit their actions were undertaken pursuant to policies, customs, and training, Plaintiff has not identified any specific policy, custom, etc., that was a moving force behind the alleged constitutional violations; (2) Plaintiff has not shown that Sheriff Jones personally participated in any of the conduct underlying the Complaint; (3) neither the initial seizures nor the ongoing of retention of Plaintiff's weapons violated the Second or Fourth Amendments; (4) Defendant Robinson is entitled to qualified immunity in any event; and (5) Plaintiff has offered no facts to support her Bane Act claim.

The Court addresses a few threshold matters before moving to the more substantive issues. First, the Court agrees with Defendants that Plaintiff has not shown that Sheriff Jones personally participated in or failed to prevent any deprivation of Plaintiff's constitutional rights. Nor has Plaintiff made a showing of "threat, intimidation,

---

[6] The Court concludes that Defendants' Motion for Summary Judgment was timely and DENIES Plaintiff's Motion to Strike directed at Defendants' moving papers.

10

or coercion." Cal. Civ. Code § 52.1.  Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Sheriff Jones and as to Plaintiff's Bane Act claim.

Second, Plaintiff seeks judgment that the warrant was overbroad to the extent it authorized the search of personal property, financial documents, etc.  See Pl.'s Mot., ECF No. 45, at 16-17.  Plaintiff's Complaint does not even remotely allude to these additional components of the warrant however, and the Court concludes that they are beyond the scope of this case.  Plaintiff's Motion is thus DENIED as moot to the extent she seeks judgment on the overbreadth of the warrant on any basis not related to the taking of the firearms (i.e., as to items 4, 6, 7, 8, 9, 10, 11, and the unnumbered request concerning vehicles).  Claims regarding those items are not before the Court and will not be considered.

The Court addresses the remainder of Plaintiff's causes of action in turn.

### A.     The December 25 seizure of Plaintiff's long guns

Plaintiff argues the seizure of the long guns in her closet was unconstitutional because (1) they were seized without a warrant or consent, and (2) they were neither contraband nor evidence of a crime.  See Pl.'s Mot., at 13–14.  Plaintiff relies on the United States Supreme Court's decision in Caniglia v. Strom, 593 U.S. 194 (2021) ("Caniglia"), which, according to her, held that the community caretaking exception to the Fourth Amendment "cannot justify seizing firearms without consent and where the firearms were not evidence of crime or contraband." Id. at 14.  However, the Supreme Court's holding was not so specific and the facts of Caniglia are easily distinguishable.

In Caniglia, during an argument with his wife, the petitioner "retrieved a handgun from the bedroom, put it on the dining room table, and asked his wife to 'shoot him now and get it over with.'" 593 U.S. at 196 (alteration omitted).  After declining to do so, the petitioner's wife left to spend the night at a hotel but called the police the next morning when she could not reach the petitioner by telephone and requested a welfare check. See id.  Police officers subsequently "accompanied petitioner's wife to the home, where they encountered petitioner on the porch." Id.  The petitioner spoke to the officers and

"confirmed his wife's account of the argument, but denied that he was suicidal." Id. Nevertheless, the officers "thought that petitioner posed a risk to himself or others[,]" and called an ambulance. Id. The petitioner "agreed to go to the hospital for a psychiatric evaluation—but only after [the officers] allegedly promised not to confiscate his firearms." Id. at 196-97. However, once the petitioner left in the ambulance, the officers entered the home and took two handguns. See id. at 197.

The petitioner later sued the police officers on grounds that they "violated the Fourth Amendment when they entered his home and seized him and his firearms without a warrant." Id. The district court granted summary judgment in favor of the police officers, and "the First Circuit affirmed solely on the ground that the decision to remove petitioner and his firearms from the premises fell within a 'community caretaking exception' to the warrant requirement[.]" Id. In reversing the lower courts' decisions, the Supreme Court rejected "a freestanding community-caretaking exception" to the warrant requirement, but nonetheless reiterated that "law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."[7] See id. at 198 (quoting Kentucky v. King, 563 U.S. 452, 460 (2011)) (internal quotation marks omitted).

Unlike in Caniglia, where the petitioner was found on his porch and taken to a hospital for a psychiatric evaluation, Stucky was not located that night and it is undisputed that he resided at the same address as Plaintiff, even if it turned out he lived in a separate building on the property. Furthermore, the SCSD deputies were responding to a call that Plaintiff's son was trying to kill her and that he had a gun, see Ex. B, Paul Decl., ECF No. 50-2, at 20, whereas the officers in Caniglia were performing

---

[7] The Supreme Court primarily took issue with the First Circuit's reliance on Cady v. Dombrowski, 413 U.S. 433 (1973) ("Cady"), which held that "a warrantless search of an impounded vehicle for an unsecured firearm did not violate the Fourth Amendment." See Caniglia, 141 S. Ct. at 1598–99. Ultimately, the Court's decision in Caniglia reiterated the longstanding principle that "[w]hat is reasonable [under the Fourth Amendment] for vehicles is different from what is reasonable for homes," and declined to apply Cady to justify warrantless searches and seizures in the home. See id. at 1599–1600.

a welfare check at the request of the petitioner's wife. 593 U.S. at 196. "No emergency circumstances existed in Caniglia that justified a warrantless entry to confiscate firearms inside the home of a man who was taken away for a psychiatric evaluation." Villegas v. City of L.A., No. 2:20-cv-07469-SB-JC, 2021 WL 6144184, at *5 (C.D. Cal. Nov. 24, 2021). The same cannot be said here with Stucky still at large and him already stealing one of Plaintiff's firearms from Plaintiff's bedroom, where it was likely he knew he could obtain more weapons. See District of Columbia v. Heller, 554 U.S. 570, 626 (2008) (stating that "the right secured by the Second Amendment is not unlimited" and that it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

Based on the undisputed facts and differences with Caniglia, it can be reasonably inferred that exigent circumstances existed (i.e., protecting Plaintiff from imminent injury) and thus the deputies' seizure of Plaintiff's long guns for "safekeeping" was reasonable. Accordingly, Defendant's Motion for Summary Judgment as to the December 25 seizure of Plaintiff's firearms is GRANTED.

### B. The validity of the December 26 warrant

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In determining whether a warrant is overbroad, "there must be probable cause to seize the particular things named in the warrant." United States v. SDI Future Health, Inc., 568 F.3d 684, 702–03 (9th Cir. 2009) (citation and alterations omitted); see also United States v. Diaz, 491 F.3d 1074, 1078 (9th Cir. 2007) (defining probable cause as "a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances.").

Here, Plaintiff argues that the December 26, 2019, warrant was overbroad, specifically that SCSD deputies had no probable cause to search for and seize her firearms. See Pl.'s Mot., at 14–17. Given the specific circumstances of this case, the

Court disagrees.

According to Plaintiff, there was no probable cause to seize her other firearms because the SCSD deputies:

> knew (a) no firearms or other weapon of any type was used in the assault on [Plaintiff] other than a wooden dowel; (b) Stucky was the only suspect, he acted alone, had no accomplices and was likely motivated by his mental illness (schizophrenia); (c) there was no evidence or suspicion of any illegal drug activity of any type at [Plaintiff's] residence; (d) [Plaintiff] was the lawful owner of firearms that had no connection of any type to Stucky's assault on his mother; (e) the only firearm-related offense was Stucky taking, upon fleeing his mother's house, a specifically identified (by make, model and serial number) handgun lawfully owned by [Plaintiff], thus giving rise to crimes of possible theft and felon in possession of a firearm; and (f) deputies recovered that handgun before Robinson submitted his warrant application to the superior court.

Id. at 16. The problem with Plaintiff's arguments is that they all assert facts we know now but that were not established at the time and that officers had a duty to investigate. At the time the warrant was sought and issued, the investigation was rapidly evolving. It is undisputed that Stucky resided at the same address as Plaintiff, even if it has now been confirmed he lived in a different building. Stucky was a felon who had taken at least one firearm from his mother's residence and should not have had access to any of them. There was no way for officers to confirm before the warrant application was submitted that the handgun recovered from Stucky was the exact handgun Plaintiff indicated he had taken. Nor were officers required to accept as true that Stucky could not access the safe or that it was impossible for him to have located other firearms on the property. If Stucky had access to the safe or to additional weapons, that would be yet another basis for charging him as a felon in possession. In addition, while Plaintiff advised officers that only a wooden dowel was used in her attack, they were still obliged to investigate the scene to determine whether that was the case.

///

There was thus ample probable cause to justify seizing Plaintiffs' firearms.[8]  Defendants'

---

[8] For the same reasons, the Court concludes that Robinson is entitled to qualified immunity

Motion for Summary Judgment is GRANTED as to the seizure of the weapons on December 26.[9]

### C. Defendants' delay in returning Plaintiff's firearms

Plaintiff next contends that Defendants' ongoing retention of her firearms was unconstitutional under the Second, Fourth, and Fourteenth Amendments. Once Stucky was convicted, Plaintiff sought the return of her guns, and Defendants advised that she had to seek authorization from the Bureau for their release under California Penal Code § 33855. Section 33855 provides, in pertinent part:

> A law enforcement agency or court that has taken custody of any firearm, ammunition feeding device, or ammunition shall not return the firearm, ammunition feeding device, or ammunition to any individual unless all of the following requirements are satisfied:
>
> (a) The individual presents to the agency or court notification of a determination by the department pursuant to Section 33865 that the person is eligible to possess a firearm, ammunition feeding device, or ammunition.
>
> (b) If the seized property is a firearm and the agency or court has direct access to the Automated Firearms System, the agency or court has verified that the firearm is not listed as stolen pursuant to Section 11108.2, and that the firearm has been recorded in the Automated Firearms System in the name of the individual who seeks its return.

It is undisputed that once Plaintiff submitted the requisite paperwork, her guns were released to her. The question then is whether Defendants' adherence to this state regime violated Plaintiff's constitutional rights. The Court concludes it did not.

In Cupp v. Harris, Case No. 2:16-cv-00523-TLN-KJN, 2023 WL 5488420, (E.D. Cal. 2023), another court in this district considered a challenge to the constitutionality of

---

because it was reasonable for him to believe that there was probable cause supporting the warrant. See Messerschmidt v. Millender, 565 U.S. 535, 549 (2012).

[9] Plaintiff has not specifically challenged the December 26 seizure of her firearms on Second Amendment grounds. Regardless, because the Court concludes that because the warrant was not overbroad, the Fourth Amendment was not violated and the seizure was thus proper, any Second Amendment argument would fail as well. Plaintiff has identified no case law, nor has the Court found any, standing for the proposition that a constitutionally permissible Fourth Amendment seizure of firearms can nonetheless give rise to a Second Amendment claim. Accordingly, to the extent Plaintiff is attempting to make that argument here, it is rejected and Defendants are entitled to judgment on any Second Amendment cause of action as to the confiscation pursuant to the warrant.


California's Law Enforcement Gun Release "LEGR" regime and concluded no violation had been identified under the framework set forth in New York Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 215 (2022). That analysis is instructive:

> Under the second step of the Bruen framework, the government bears the burden to show the prohibition at issue is "consistent with the Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2126. This inquiry will be straightforward in some cases while in others it "will often involve reasoning by analogy." Id. at 2131. The Attorney General asserts additional expert discovery is necessary before this Court can reach step two of the Bruen analysis. (ECF No. 105 at 8–9.) The Court disagrees.
>
> Plaintiffs argue the state can "produce no historical analog as to why Plaintiffs are required to make an application and pay a fee for the return of their arms when they committed no crime." (ECF No. 108 at 13.) Plaintiffs claim, "there is no historical analog as to why Plaintiffs' property was not returned just as a wallet or knife is returned as personal property." (Id. at 14.) Plaintiffs' arguments, however, have a fatal flaw — they fail to account for the narrowest holding of Bruen, which speaks to shall-issue style regulations.
>
> In applying step two to the New York regulation, the Supreme Court explicitly noted "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States 'shall-issue' licensing regimes." Bruen, 142 S. Ct. at n. 9. This is because, as the Court explained "shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." Id. (internal quotations omitted). This is further outlined by the narrowing concurrence. The concurrence is clear that shall-issue regimes, which may require "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements" "are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." Id. at 2162. Accordingly, shall-issue style regulatory regimes that are designed to ensure only law-abiding, responsible citizens bear arms, are lawful. Id. This is subject only to an as-applied challenge that the shall-issue regime fails to operate properly in practice. See id. ("shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense . . . shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice.")
>
> Guided by this holding, the Court finds Plaintiffs fail to state a

        claim challenging the LEGR framework, which requires a background check, filling out a form, and paying a nominal fee. The FAC outlines the LEGR process, including the eligibility application requirement (Cal. Penal Code § 33850), the firearm return process requirements (Cal. Penal Code § 33855), and the fee requirements (Cal. Penal Code §§ 33860, 33880.) (ECF No. 83 at 6–7.) The FAC also alleges facts related to Cupp's arrest, seizure of alleged arms, as well as his criminal case and its subsequent dismissal. (Id. at 7–8.) The FAC further alleges facts related to Haven's arrest, dismissal of his criminal case, and the seizure of his alleged arms. (Id. at 8–12.) Plaintiffs allege "[b]y failing to immediately return Plaintiffs' firearms once it was determined that no crime had been committed, [the Attorney General] has deprived Plaintiffs of their ability to exercise their Second Amendment right . . . ." (Id. at 10.)

        These facts are insufficient to state a claim for relief. The LEGR process mandates that once a firearm or ammunition is in the custody or control of a law enforcement agency or court, the owner of that firearm must proceed through a process to ensure they can lawfully possess that firearm or ammunition before the firearm can be returned. This is made clear from the text of the LEGR regulations which are outlined in the FAC. The LEGR process, therefore, is an analogue to the shall-issue regimes discussed in Bruen and for that reason are lawful. To challenge these regulations, the complaint must contain factual allegations that this shall-issue style regime fails to operate properly in practice. Bruen, 142 S. Ct. at 2162. Plaintiffs fail to do this. There are no allegations in the FAC that the LEGR process is different in practice than any other shall-issue style regime, no allegations that the LEGR process provides for discretionary decision making by the Attorney General, no allegations that it functions more as a may-issue regulation, and no allegations that it is or was applied to Plaintiffs in an improper way. For these reasons, the FAC fails to state a claim as to a Second Amendment violation.

Id., at *5-6.

        The facts of this case are materially indistinguishable from Cupp. It is undisputed that once Plaintiff resolved her name issue and submitted the requisite paperwork, her firearms were returned to her. The California statute in this case operated no differently than the "shall-issue" schemes contemplated in Bruen. Accordingly, there can be no constitutional violation. Defendants' Motion for Summary Judgment as to the ongoing retention of Plaintiff's weapons is thus GRANTED.[10]

---

[10] Given the Court's forgoing holdings, it need not reach the question of whether Plaintiff can establish Monell liability as to the entity Defendants. The County and SCSD argue that Plaintiff has not identified the policies that purportedly led to her constitutional violations. The Court is troubled, however,

**CONCLUSION**

For the foregoing reasons, it is hereby ordered that:

1. Plaintiff's Motion to Strike Exhibit A, ECF No. 51, is GRANTED;

2. Plaintiff's Motion to Strike Exhibit D, ECF No. 52, is DENIED as moot;

3. Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment, ECF No. 63, is DENIED.

4. Plaintiff's Motion for Partial Summary Judgment, ECF No. 45, is DENIED.

5. Defendants' Motion for Summary Judgment, or in the Alternative Partial Summary Judgment, ECF No. 61, is GRANTED in its entirety.

6. The Clerk of the Court is directed to enter judgment in Defendants' favor and close this case.

IT IS SO ORDERED.

Dated: May 13, 2024

_____
MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE

---

by the fact that Defendants admitted that each of their actions in this case was taken pursuant to some unarticulated policy or custom. While the Court could not grant judgment on Monell liability in Plaintiff's favor, without knowing what those policies might be, denying Plaintiff relief would also seem to be in tension with Defendants' admissions. As indicated, that tension need not be resolved today. Should the Court be squarely faced with the question in the future, however, more detailed discussion from both sides would be warranted.